IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| PARIS MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 1:14-CV-08940 |
| | ) | |
| CITY OF CHICAGO, OFFICER VICTOR | ) | |
| RAZO, OFFICER YESENIA MEDINA, | ) | |
| OFFICER PATRICIA MARTINEZ, AND | ) | |
| OFFICER DAVID SANCHEZ, | ) | JUDGE RONALD A. GUZMAN |
| | ) | |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Paris Martin, by and through her attorneys, Loevy
& Loevy, complains of Defendants City of Chicago, Chicago Police
Officers Victor Razo, Yesenia Medina, Patricia Martinez and
David Sanchez (collectively, the "Defendant Officers"), and
states as follows:

**Introduction**

1.   Ms. Paris brings this action pursuant to 42 U.S.C. §
1983 to redress Defendant Officers' violations of her
constitutional rights.

2.   Specifically, the Defendants Officers used
unreasonable force against Mr. Martin, breaking her collar bone
without justification. This action seeks redress for that
injustice.

## Jurisdiction and Venue

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1367.

4.    Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein all occurred within the district, Defendant City of Chicago is a municipal corporation located here, and, on information and belief, all or most of the parties reside in this judicial district.

## Parties

5.    Ms. Paris is a 28-year old lifelong resident of Chicago and the mother of two.  Ms. Paris graduated from Paul Robeson High School in Chicago and has worked as a private security guard and a home health aid.  Ms. Paris is currently a full-time student at Olive-Harvey College where she is studying computer information systems.

6.    Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

7.    Defendant Officer Victor Razo (Star Number 3425) is an officer with the Chicago Police Department.

8.    Defendant Officer Yesenia Medina (Star Number 18375) is an officer with the Chicago Police Department.

9.    Defendant Officer Patricia Martinez (Star Number 18375) is an officer with the Chicago Police Department.

2

10.   Defendant Officer David Sanchez (Star Number 16962) is an officer with the Chicago Police Department.

### Factual Allegations

11.   On the evening of September 22, 2014, Ms. Paris was in her friend's car parked across the street from her home located on the 8700 block of South Burley Avenue, Chicago, Illinois.

12.   Ms. Paris and her friend were talking in the car and the car's ignition and lights were off.

13.   While they were speaking, Ms. Paris and her friend observed a grey unmarked police car speed northbound on South Burley Avenue.

14.   The grey unmarked squad car did not have on its emergency lights, headlights or sirens.

15.   A few moments later, Ms. Paris observed a blue and white Chicago police squad car drive southbound on South Burley Avenue with its lights and sirens on.

16.   Officers Martinez and Sanchez were in the marked squad car and were responding to a call on the same block of South Burley.

17.   The grey unmarked car turned around and headed back southbound on South Burley with its lights activated.

18.   Defendants Officers parked the grey unmarked squad next to where Ms. Paris and her friend were sitting in his car.

3

19.   Officers Medina and Razo exited the grey unmarked squad car and approached Ms. Paris and her friend.

20.   Officer Razo approached the passenger side of the car where Ms. Paris was sitting and ordered her to get of the car.

21.   When Ms. Paris inquired for what reason, Officer Razo told her to "Get the fuck out of the car," or words to that effect.

22.   Officers Razo and Medina knew Ms. Paris had committed no crime nor did they have any reasonable basis to fear for their safety.

23.   Despite lacking any legal justification, Officer Razo forcibly removed Ms. Paris from the car and then slammed her up against the car.

24.   He then proceeded to pull Ms. Paris's left arm behind her back twisting it into a painful position.

25.   While he held her arm behind her back, Officer Razo slammed Ms. Paris's body, including her left upper chest, against the car several more times.

26.   Ms. Paris complained that he was going to break her arm and told him that he could just speak to her.

27.   Officer Razo responded by grabbing Ms. Paris's arm more forcefully.

28.   Officers Medina, Sanchez and Martinez stood by and watched, but took no actions to stop this use of force, despite

4

being in close physical proximity and having the opportunity to intervene.

29.   Officer Razo then put Ms. Martin in handcuffs although she had not broken any laws.

30.   Officer Medina escorted Ms. Paris to the grey unmarked car and told her to stand by the driver's side of the vehicle while Officer Razo searched her and her friend's name in their computer.

31.   Without any legal justification, the Defendant Officers then took Ms. Paris's friends' keys from his pocket while he was cuffed and searched his car.  They did not find any illegal contraband whatsoever, because there was none.

32.   The Defendant Officers proceeded to give Ms. Paris's friend a ticket for not having a Chicago car registration sticker.

33.   The Defendant Officers ran Ms. Paris's name in their computer searching for any outstanding warrants.  There were none.

34.   Officers Medina and Razo then returned to the grey unmarked squad car and started driving Ms. Paris around the neighborhood, discussing among themselves what they should do with Ms. Paris.

35.   After harassing Ms. Paris for some time and threatening to bring her to the police station to book her

5

despite the fact that they knew she had committed no crime, Officers Razo and Medina let her go on the street approximately one block away from her home.

36.  As they drove away, Ms. Paris observed that the unmarked car's license plate number was MP 5828.

37.  Upon returning to her home, Ms. Paris felt excruciating pain in her left shoulder and upper left chest and was unable to bear any weight on her left arm.

38.  Because of the pain, Ms. Paris went to seek medical treatment at Advocate Trinity Hospital that same evening.

39.  Ms. Paris was diagnosed with a fractured clavicle bone and acute shoulder pain.

### The City of Chicago's Policies and Practices

40.  The Defendant Officers' unlawful conduct was directly caused by the Chicago Police Department's ("CPD's") *de facto* policy, practice, and custom of failing to adequately train, supervise, investigate, discipline, and control its police officers.

41.  As a matter of both policy and practice, Defendant City of Chicago facilitates the very type of misconduct at issue here by failing to adequately investigate officers accused of misconduct, punish and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe

their actions will never be scrutinized, and in that way, directly encouraging future abuses such as those affecting Plaintiff.

42.  Specifically, Chicago Police Officers accused of excessive force can be confident that the Independent Police Review Authority ("IPRA"), formerly the Office of Professional Standards ("OPS"), will not investigate those accusations in earnest and will refuse to recommend discipline even where the officer has engaged in excessive force.

43.  Indeed, municipal policymakers have long been aware of the City of Chicago's policy and practice of failing to properly train, monitor, investigate and discipline its police officers, but have failed to take actions to remedy the problem.

44.  Under OPS, several policymakers identified the problems with the City's policies and practices relating to the use of force, including:

    a.  Superintendent Terry Hillard specifically noting the need for (1) better in-service training on the use of force; (2) early detection of potential problem officers, and (3) officer accountability for the use of force at a City Council hearing on September 28, 1999, in response to two high profile unjustified police shootings;

    b.  The Chairman of the Committee on Police and Fire of the Chicago City Council submitting an official

7

resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct," in June 2000;

    c.   The Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirming the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct and brutality in 2001. The JCGC findings were presented to Mayor Daley, Superintendent Hillard and the Chicago Police Board; and

45. Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

46. In 2007, after two highly publicized incidents of off-duty officers assaulting civilians that were captured on videotape (the Abbate and Jefferson Tap cases), the City Council dissolved OPS and created IPRA to investigate and discipline police officer misconduct.

47. Although the City Council changed the name of the organization responsible for investigating and disciplining

8

officer misconduct, the IPRA regime has perpetuated the same policies and practices that existed under OPS. Specifically, IPRA's investigations into officer misconduct are inadequate and untimely, and IPRA recommends discipline in a disproportionately small number of times when officers are accused of using excessive force.

48. For example, IPRA maintains a similarly low sustain rate of complaints brought against officers accused of misconduct, including excessive force. In 2004, under the OPS, the City self-reported that it sustained only four percent of the complaints brought against police officers accused of excessive force. In IPRA's most recently published annual report available on-line, it reported that it sustained just under four percent of all complaints brought against officers, not just excessive force complaints for the 2011 to 2012 reporting period. *See* http://www.iprachicago.org/IPRA_AnnualReport2010-2012.pdf at page 31; Tables 1-3 (reporting that 105 complaints were sustained in the 2688 investigations that were closed during the annual cycle).

49. Even in the most extreme example of excessive force, the IPRA regime exonerates CPD officers who shoot Chicago residents in over 99% of cases, regardless of the actual circumstances of the shooting, as was the case under OPS.

9

50.  Indeed, since 2000, the City of Chicago has not found any police shooting by a CPD officer to have been unjustified.

51.  This statistic is remarkable given the high frequency with which shoot members of this community:  CPD officers shot 61 people in 2009, killing 19; 46 people in 2010, killing 13; 60 people in 2011, killing 23; and 57 people in 2012, killing 8, according to Officer-Involved Shooting Annual Reports, Independent Police Review Authority, available at http://www.iprachicago.org/resources.html.

52.  By comparison, in 2012, New York City police officers shot just 30 people, even though New York City has a population approximately three times greater than that of Chicago, according to Annual Firearms Discharge Report for 2012, published by the New York Police Department.  In a Wall Street Journal interview, New York Police Commissioner Raymond Kelly credited New York's success in reducing police shootings to its "improvement in training procedures and a more thorough shooting-review process."

53.  Another example of IPRA's failure to investigate claims is the long delays in concluding its investigations, despite the relative straight-forward nature of many excessive force claims.  IPRA's failure to timely investigate allegations of excessive force has even lead to a serious case of excessive force in which an officer beat a man on his head with a baton,

cracking his scull, being thrown out by the Police Board because
IPRA failed to pursue charges before the five years statute of
limitations had expired.  In that case, the complainant had
provided a statement and photographs of his injuries just days
after the incident yet it took IPRA more than five years to
decide to pursue charges against the officer.  *See* Annie Sweeney
and Jeremy Gorner, *Police Misconduct Investigation Drags On For
Years – Investigative agency's delays can lead to dismissal of
charges*, Chicago Tribune, June 17, 2012.

54.  Although the City of Chicago has long been aware that
its supervision, training, and discipline of police officers is
entirely inadequate, it has not enacted any substantive measures
to address that failure despite the change in name from OPS to
IPRA, including failing to adequately and thoroughly investigate
citizen complaints of excessive force, failure to implement a
system to identify and track repeat offenders, districts or
units, and failure to implement modifications to their officer
training programs.

55.  Instead, policymakers have consistently maintained an
attitude of deliberate indifference, ignoring these issues. For
example, at the most recent City Council meeting regarding its
oversight of IPRA held on October 29, 2014, less than twelve
councilmembers were present and not one asked as single question
about IPRA's performance investigating fatal shootings by

11

officers or about the number of excessive force complaints the agency has sustained. *See* Chip Mitchell, *Aldermen skip chance to ask about city's handling of police commander*, WBEZ (Oct. 29, 2014), *available at* http://www.wbez.org/news/aldermen-skip-chance-ask-about-citys-handling-police-commander-111016.

56.   But the failure of the City's policies does not just stop with IPRA.  Even when IPRA has recommends some form of discipline, the Police Superintendent can override IPRA's recommendation.

57.   For example, earlier this year, Police Commander Glen Evans of the Harrison District was accused of ramming his pistol down and arrestee's throat.  IPRA recommended that Commander Evans be stripped of his police powers pending their investigation after finding DNA evidence of the victim on Evans's gun.  Ignoring IPRA's recommendation, Police Superintendent Garry McCarthy and Mayor Rahm Emmanuel supported Evans and he remained in his leadership position as District Commander until he was criminally indicted in August 2014.

58.   Indeed, in 2012, Superintendent McCarthy promoted Evans to a leadership position in the Department despite the fact that over the course of his career there were over fifty excessive force citizen complaints filed against him.  A report by the now deceased Chicago epidemiologist, Dr. Steve Whitman, found that Evan was ranked number one out of 1,541 officers he

12

studied as having received the most excessive force complaints
in his analysis of 13,527 excessive force complaints against
Chicago Officers from 1998-2008.  *See* Chip Mitchell, *Report:
Embattled commander No. 1 for excessive-force complaints*, WBEZ
(Aug. 5, 2014), *available at http://www.wbez.org/news/report-
embattled-commander-no-1-excessive-force-complaints-110605.*

59.  In contrast, when IPRA does not recommend any
discipline, police supervisors agree with IPRA's determination
one hundred (100) percent of the time and never independently
recommend disciplining an officer accused of excessive force.

60.  Finally, in 2012, a jury found that the "the City had
a widespread custom and/or practice of failing to investigate
and/or discipline its officers and/or code of silence" in *Obryka
v. City of Chicago et al.*, No. 07 cv 2372 (the Abbate case).

61.  As a result of the unjustified violation of
Plaintiff's rights by the Defendant Officers, undertaken
pursuant to the City's policy and practice as described above,
Plaintiff has suffered injury, including a fractured clavicle
bone, physical pain and mental distress.

## Count I -- 42 U.S.C. § 1983
## Excessive Force

62.    Each Paragraph of this Complaint is incorporated herein.

63.    As described above, the conduct of one or more of the Defendant Officers constituted excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

64.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

65.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

66.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, as described above.

67.    As a result of the Defendant Officers' misconduct described in this Count, undertaken pursuant to the City's unjustified and excessive use of force and the City's policy and practice as described above, Plaintiff has suffered injuries, including physical injury and mental distress.

14

## Count II -- 42 U.S.C. § 1983
## False Arrest/Unlawful Detention

68. Each Paragraph of this Complaint is incorporated herein.

69. As described more fully above, one or more of the Defendant Officers unlawfully detained and falsely arrested Plaintiff without justification and without probable cause.

70. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

71. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

72. The misconduct described in this Count was undertaken pursuant to the custom, policy, and/or practice of Defendant City of Chicago, such that Defendant City of Chicago is also liable, as described above.

73. As a result of Defendant Officers' misconduct described in this Count, undertaken pursuant to the City's policy and practice as described above, Plaintiff has suffered injury, including a fractured clavicle bone, physical pain and mental distress.

## Count III -- 42 U.S.C. § 1983
## Unlawful Search and Seizure

74.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

75.   As described in the preceding paragraphs, one or more of the Defendant Officers violated Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure by seizing Plaintiff without justification and without probable cause and by conducting illegal searches of her body.

76.   The misconduct described in this Count was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

77.   The misconduct described in this Count was undertaken pursuant to the custom, policy, and/or practice of Defendant City of Chicago, such that Defendant City of Chicago is also liable, as described above.

78.   As a result of Defendant Officers' misconduct described in this Count, undertaken pursuant to the City's policy and practice described above, Plaintiff has suffered injuries, including physical injury and mental distress.

### Count IV -- 42 U.S.C. § 1983
### Failure to Intervene

79.  Each Paragraph of this Complaint is incorporated herein.

80.  As described more fully above, one or more of the Defendant Officers had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights as set forth above, but failed to do so.

81.  The Defendant Officers' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights.

82.  As a result of the Defendant Officers' failure to intervene, undertaken pursuant to the City's policy and practice as described above, Plaintiff has suffered injuries, including physical injury and mental distress.

### Count V -- State Law Claim
### Assault and Battery

83.  Each Paragraph of this Complaint is incorporated herein.

84.  As described in the preceding paragraphs, the conduct of Defendant Razo, acting within the scope of his employment, constituted unjustified and offensive physical contact, undertaken willfully and wantonly, proximately causing Plaintiff's bodily injuries.

17

85. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

86. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

87. As a result of the offensive touching, undertaken pursuant to the City's policy and practice as described above, Plaintiff sustained bodily and other injuries, including but not limited to her fractured clavicle bone.

### Count VI -- State Law Claim
### Intentional Infliction of Emotional Distress

88. Each Paragraph of this Complaint is incorporated herein.

89. The actions, omissions, and conduct of the Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

90. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered injury, including emotional distress.

## Count VII -- State Law Claim
## Conspiracy

91.    Each of the Paragraphs of this Complaint is incorporated herein.

92.    In the manner described above, the Defendant Officers reached an agreement among themselves to frame Plaintiff for crimes he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

93.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

94.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

95.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered injury, including emotional distress.

**Count VIII -- State Law Claim**
**Respondeat Superior against City of Chicago**

96. Each Paragraph of this Complaint is incorporated herein.

97. In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

98. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**Count IX -- State Law Claim**
**Indemnification**

99. Each Paragraph of this Complaint is incorporated herein.

100. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

101. The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

WHEREFORE, Plaintiff Paris Martin respectfully requests that this Court enter judgment in her favor and against Defendants City of Chicago, the Defendants Razo, Medina, Martinez and Sanchez, awarding compensatory damages and attorneys' fees, along with punitive damages against the individual defendants in their individual capacities, and any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff Paris Martin hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: December 22, 2014          RESPECTFULLY SUBMITTED,


                                  /s/ Heather Lewis Donnell
                                  Attorneys for Plaintiff

                                  Arthur Loevy
                                  Jon Loevy
                                  Heather Lewis Donnell
                                  LOEVY & LOEVY
                                  312 North May St., Suite 100
                                  Chicago, IL 60607